MAb

FILED_____ ENTERED
_____ LOGGED_____ RECEIVED

DEC 1 8 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICES ASSIGNED CALL NUMBERS (304) 240-6517 AND (717) 217-9094, THAT IS STORED AT PREMISES CONTROLLED BY SPRINT WIRELESS** | 1 9 - 3 9 6 5   ADC<br><br>Case No. _____ |
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (410) 917-7365, THAT IS STORED AT PREMISES CONTROLLED BY AT&T WIRELESS** | 1 9 - 3 9 6 6   ADC<br><br>Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, James Walsh, Task Force Officer, of the Federal Bureau of Investigation ("FBI"),

being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      This affidavit is being submitted in support of an application for a search warrant

that seeks authorization for the disclosure of information, including historical cellular site

information, for the following three **TARGET TELEPHONES**, as further described in

Attachments A-1 and A-2:

a.      Cellular telephone assigned call number (304) 240-6517 ("**TARGET**

**TELEPHONE 1**"), with International Mobile Subscriber Identity/Electronic Serial

Number 310120072305556, subscribed to Timothy LEGARD, whose listed address is

277 Specks Run Road Apt 1, Bunker Hill, West Virginia.   The information is stored at

1

Sprint Wireless, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas;

   b. Cellular telephone number assigned call number (410) 917-7365 ("**TARGET TELEPHONE 2**") with International Mobile Subscriber Identifier 310410093483252, which lists no subscriber information. The information is stored at premises controlled by AT&T Wireless, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Ste 600, North Palm Beach, Florida 22408; and

   c. Cellular telephone assigned call number (717) 217-9094 ("**TARGET TELEPHONE 3**") which lists no subscriber. The information is stored at Sprint Wireless, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas.

  2. The information to be searched is described in the following paragraphs and in Attachment B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Service Provider(s) to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachments B.

  3. The information set forth in this affidavit derives from my personal knowledge and observations, discussions with other FBI agents and employees, other law enforcement officers, and witnesses, and my review of police reports and public records. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Because I submit this affidavit for the limited purpose of establishing probable cause for a search warrant, I have not included every fact known to me concerning this investigation.

Rather, I set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

4.     I submit there is probable cause to believe that the requested information associated with the **TARGET TELEPHONES** contains evidence of violations of 21 U.S.C. §§ 841, 846, conspiracy to distribute and possess with intent to distribute controlled substances. Therefore probable cause exists to search the information described in Attachments A-1 and A-2 for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B, respectively.

## AGENT BACKROUND AND EXPERIENCE

5.     I am a Detective with Montgomery County Police Department (MCPD), Special Investigations Division, Drug Enforcement Section, Major Offenders/Conspiracy Unit and have been employed with the MCPD since July 2008. Prior to being employed with MCPD, from October 2001 to July 2008, I was a sworn law enforcement officer with the United States Park Police. I have been specially deputized as a Task Force Officer (TFO) by the Federal Bureau of Investigation (FBI) and has authority under Title 21, United States Code, since October of 2014. I graduated from the Federal Law Enforcement Training Center (FLETC) in 2002 and the MCPD Training Academy in January 2009.

6.     During my eighteen years as a law enforcement officer, to include the past six years of conducting undercover narcotics investigations, I have performed controlled purchases of drugs and street level surveillance of drug transactions; utilized informants to make controlled purchases of drugs; worked in an undercover capacity on several occasions involving narcotics investigations targeting street level and interstate narcotics traffickers; obtained and executed

search warrants as a result of drug investigations; attended numerous courses and seminars covering drug recognition, interdiction, money laundering, conspiracy investigations and secure communications interception; participated in and been a co-case agent on Title III wiretap investigations involving federal narcotics violations; and been recognized and testified as an expert in narcotics trafficking by the Circuit Court and Juvenile Court for Montgomery County, Maryland.

7.     Based on my training and experience, I am familiar with the means and methods that narcotics traffickers use to import and distribute illicit drugs. I am familiar with the support and assistance that narcotics organizations require to conduct their illegal activities. I am also become knowledgeable about the criminal statutes of the United States, particularly in the laws relating to violations of the federal narcotics and conspiracy statutes.

8.     Specifically, with respect to cellular telephones, computers, and other "smart" electronic devices, such as tablets, I know the following information based upon my training, experience and participation in this and other investigations involving drugs and firearms, as well as conversations with other investigators:

   a.     Individuals engaged in drug trafficking offenses often use cell phones and electronic devices to communicate with suppliers; to place orders with suppliers; to communicate with customers; to receive orders from customers; and to choose meeting times and locations for the distribution of controlled substances. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

b.      Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

c.      Cellular telephones, computers, and other smart devices are an indispensable tool of the narcotics trafficking trade. Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers. In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their DTO, or at random in order to frustrate law enforcement efforts.

d.      Drug traffickers often place nominal control and ownership of telephones in names other than their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

e.      Drug traffickers utilize multiple and different types of communication devices, and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that drug traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a drug trafficker utilizing one cellular

telephone to communicate with customers, and utilizing another cellular telephone to communicate with a source of supply of drugs.

       f.     Cell phones and similar smart devices associated with drug traffickers include various types of evidence. They may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators.

       g.     The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

     9.     I know from my training, knowledge, and experience that cell phones and other smart devices often record the phone's historical location data, indicating the location of stash houses, distribution points, and supply sources. I also know that capturing and analyzing the cellular telephone geolocation of a phone used by a drug trafficker can provide important evidence of: (1) the location of the drug trafficking itself, including the spot where drug sales are conducted, solicited, or transacted; (2) the location where a drug dealer stores and stashes his drugs, including his personal residence or another dwelling used for the storing of controlled substance; (3) the location of suppliers, customers, or coconspirators that a drug dealer may meet with; (4) the location of meetings among various members of the conspiracy; (5) corroboration of physical drug trafficking activity observed by investigators; and (6) the overall pattern of travel for a particular drug trafficker. Further, the capture of geolocation information can corroborate physical observations of drug transactions and other conspiratorial conduct of POPS

and others. Accordingly, the location of a cellular phone used by a drug trafficker can provide important evidence of the drug trafficking conspiracy.

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

### Background on Cell Site Data

11.     In my training and experience, I have learned that Sprint Wireless and AT&T Wireless are companies that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or cell tower/sector records.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

12.     Based on my training and experience, I know that Sprint and AT&T Wireless can collect cell-site data about the **TARGET TELEPHONES**.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service

provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as Sprint and AT&T Wireless typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

13.     Based on my training and experience, I know that Sprint and AT&T Wireless also collects per-call measurement data, which Sprint and AT&T Wireless also refers to as the "real-time tool" ("RTT").  RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

14.     Based on my training and experience, I know that wireless providers such as Sprint and AT&T Wireless typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as Sprint and AT&T Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the

8

user or users of the **TARGET TELEPHONES** and may assist in the identification of co-conspirators and/or victims.

## PROBABLE CAUSE

15.     In 2016, Special Agents and Officers of the FBI and Montgomery County Police Department began investigating a drug trafficking organization (the "DTO") distributing large quantities of heroin and cocaine in and around the Baltimore metropolitan area. The DTO operated in the Baltimore metropolitan area, and was a narcotics source of supply for customers traveling from Maryland, Virginia, West Virginia, Pennsylvania, and the District of Columbia. In the course of the investigation, the FBI and MCPD identified Gregory BUTLER as a leader of the DTO.  BUTLER had the access and means to distribute kilogram-level quantities of heroin and cocaine, in addition to crack cocaine. Weekly narcotics distribution is estimated at a range of one or more kilograms, supplied to customers by vetted DTO re-distributors at one of several pre-determined buy locations across the Baltimore metro area.  One of these pre-determined buy locations was "4414 Alan Drive."  It is estimated that over five hundred individual customers purchased from BUTLER or his co-conspirators by contacting one of his many phones, purchasing between user "point" quantities and/or redistributor quantities exceeding 100 grams.

16.     BUTLER used several cell phones in furtherance of drug trafficking, which were lawfully intercepted.  Specifically, on October 2, 2018, the Honorable Catherine Blake, United States District Judge for the District of Maryland, authorized the initial interception of wire and/or electronic communications occurring over (443) 641-4783 ("TT1").  At a later date the Court authorized the initial interception of wire and/or electronic communications occurring over (304) 809-4934 ("TT4") used by BUTLER.  The interceptions terminated on/about April 3, 2019. TT1 was a "customer phone" used to place an order for narcotics.  TT4 was a phone used

by BUTLER to relay the incoming customer orders to his network of street level distributors. These street level distributors used a series of rotating cellular phones or "runner phones" which were passed on from distributor to distributor throughout day and night.

*The Sale of Drugs on November 10, 2018*

17.    On November 10, 2018, a customer using phone number (304) 240-6517 (**TARGET TELEPHONE 1**) contacted TT1 to place an order for drugs.  The following are excerpts from the intercepted conversation:

> **TARGET TELEPHONE 1**: Where too?
>
> TT1:   ,4414 Alan Dr Baltimore MD 21229
>
> …
>
> **TARGET TELEPHONE 1**: Hey bro my ride had enough fir 2 n ahalf plus the 5 u got for me is that cokl? .
>
> TT1:   OK
>
> **TARGET TELEPHONE 1**: Kool thanks so 7 nhalf altogether…Here
>
> TT1:   I know just come on shit
>
> …
>
> **TARGET TELEPHONE 1**: Here . . . We parked in a silver Pontiac vide station wagin….

18.    Based on my training and experience, in this investigation and others, the above listed SMS text exchange is consistent with a customer and source of supply arranging a drug purchase.  The user of TT1 provided a location for the purchase ("4414 Alan Drive") and the user of **TARGET TELEPHONE 1** provided the amount of drugs he sought to purchase ("7 nhalf altogether").  The user of **TARGET TELEPHONE 1** then provided a description of the vehicle being driven ("silver Pontiac vide station wagon").

19.     Based on the interceptions of TT4, investigators were able to determine that on November 10, 2018 the "runner phone" being utilized by BUTLER's street level distributors was identified as phone number 410-917-7365 (**TARGET TELEPHONE 2**).    On November 10, 2018, the user of TT4 contacted **TARGET TELEPHONE 2** regarding the above listed purchase order from **TARGET TELEPHONE 1**.  Listed below is a summary of that call:

> TT4:   Hey yo. There's a 7 1/2 right there, yo. He payin' for um, 2 1/2....just give him the other one, ya heard me.
>
> **TARGET TELEPHONE 2**: Hold on. He, so he payin' for 2 1/2 and give him the other what?
>
> TT4:   5
>
> **TARGET TELEPHONE 2**: 5 ½. Aight.
>
> TT4:   The 5 the other 5.
>
> **TARGET TELEPHONE 2**: Aight.

20.     Based on my training and experience in this investigation, BUTLER was contacting **TARGET TELEPHONE 2** to advise the street level distributor working as the runner that a purchase order has arrived.   Specifically, BUTLER states "There's a 7 1/2 right there, yo. He payin' for um, 2 ½."  I know this means that a customer was purchasing 7.5 grams of drugs has arrived, that the customer was only paying for 2.5 grams, and that the remaining 5 grams were to be provided on consignment or "fronted."  **TARGET TELEPHONE 2** then clarified this fact by asking, "Hold on. He, so he payin' for 2 1/2 and give him the other what?"

21.     As discussed next, I believe the drugs purchased above were sold to an individual named Timothy LEGARD, the user of **TARGET TELPHONE 1**, who then redistributed the drugs to two victim who overdosed.

*Two Victims Overdose on November 11, 2018*

22.     In the early hours of November 11, 2018, law enforcement officers with the Frederick County Virginia Sheriff's Office (FCSO) responded to a suspected drug overdose that occurred at the Flying J Truck Stop located at 1530 Rest Church Rd, Clear Brook, Virginia.  Law enforcement observed that a female (hereinafter "V-1") had had a non-fatal overdose inside the gas station, and she was transported to the Winchester Medical Center.  Several hours later, FCSO law enforcement officers responded to another non-fatal overdose at a Sheetz located at 1574 Martinsburg Pike, Winchester, Virginia.  A female (hereinafter "V-2") also had had a non-fatal overdose in or next to a silver Pontiac Vibe in the parking lot of the Sheetz.

23.     Both V-1 and V-2 were interviewed by law enforcement officers.  The interview established that V-1 and V-2 were friends who have used narcotics.  V-1 stated that he/she received pills from an individual named Tim LEGARD.  FCSO law enforcement observed V-1's phone and saw a contact listed for LEGARD and the associated phone number 304-240-6517, which is **TARGET TELEPHONE 1**.

24.     While speaking with V-2, he/she admitted that he/she took heroin prior to the overdose.  V-2 said that he/she had used heroin and obtained it from an individual named Tim LEGARD and that the distribution occurred near LEGARD's residence in Inwood, West Virginia.  V-2 further stated that LEGARD's drug source of supply was located in Baltimore, Maryland.  V-2 advised that LEGARD wanted a ride to his source and that V-2 used a Google phone application that mapped the address of where the source was located.  FCSO law enforcement officers observed within V-2's cellular phone the address "4414 Alan Dr in Baltimore, Maryland."  During a subsequent interview, V-2 admitted to law enforcement that he/she had had driven LEGARD to that address in order to obtain heroin, and that he/she

received heroin in exchange for giving LEGARD a ride. V-2 further advised law enforcement that her cellular telephone number was (717) 217-9094 (**TARGET TELEPHONE 3**).

25.     As described above V-2 provided transportation to Baltimore to purchase the drugs. Furthermore V-2 indicated that he/she utilized **TARGET TELEPHONE 3** to provide GPS directions to the drug purchase location provided by LEGARD's source of supply in Baltimore ("4414 Alan Drive").

## AUTHORIZATION REQUEST

26.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. I further request that the Court direct Sprint and AT&T Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

27.     To the extent that the warrant authorizes the seizure of any tangible property, any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. Because the warrant for the **TARGET TELEPHONES** seeks only permission to examine records in the possession of a wireless providers, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Respectfully submitted,

James Walsh
Task Force Officer, FBI

13

Sworn to before me this __3rd__ day of November 2019.

HON. A. DAVID COPPERTHITE
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A-1

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephones assigned call numbers **(304) 240-6517** and **(717) 217-9094** ("the Accounts"), that are stored at premises controlled by Sprint Wireless ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, Kansas.

**ATTACHMENT A-2**

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number **(410) 917-7365**  ("the Account"),  that are stored at premises controlled by AT&T Wireless ("the Provider"), headquartered at 11760 U.S. Highway 1, Ste 600, North Palm Beach, Florida 22408.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A-1 and A-2 is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account(s) listed in Attachment A-1 and A-2 from November 1, 2018 until November 14, 2018:

    a.   The following information about the customers or subscribers of the Account(s):

        i.   Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

     vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account(s), including:

     i.  Records of user activity for each connection made to or from the Account(s), including log files; messaging logs; the date, time length and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

    ii.  Information about each communication sent or received by the Account(s), including the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers, email addresses, and IP addresses);

   iii.  All data about which "cell towers" (i.e. antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Account(s); and

   iv.  Information regarding the cell towers and sectors through which the communications were sent to include Network Event Location System (NELOS) data.

18

II.     **Information to be Seized by the Government**

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 involving the **TARGET TELEPHONES** from November 1, 2018 to November 14, 2018.

With respect to the search of the information provided pursuant to this warrant by the above-referenced provider, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically-stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.